The United States Court of Appeals for the Ninth Circuit is now in session. Please be seated. Good morning, everyone. We'd like to welcome all counsel who are here arguing this morning. We greatly appreciate you being with us by video and we'll look forward to hearing all of your arguments on our calendar today. I'd like to say a special welcome to our friend, Judge Lasnik, who is visiting with us today from the Western District of Washington. Judge Bumaday and I greatly appreciate Judge Lasnik sitting by designation. Judge, it's great to have you with us today. Thank you. It's a real pleasure to sit with both of you. We have four cases on the calendar this morning. Appellants, please feel free to reserve time for rebuttal. It will be on you to watch the clock. The first case on the calendar is United States of America v. Chong, and we'll be pleased to hear from Mr. Burns. Good morning, Your Honors. Todd Burns on behalf of Arsene Chong and Pat Tron. My hope is to reserve three minutes of rebuttal time and I will keep an eye on the clock for that purpose. The central question in this appeal is whether or not deputies have entered under the curtilage of the property, Mr. Chong's home, before any exigency arose. And my hope was to use a photo from the record as a demonstrative or an exhibit here from the record, because I think it can more succinctly make my points in this regard. We have the photo. We know about it. We have a lot of photos here and we've studied them carefully. I guess my first question for you, sir, is what do you think the curtilage, how many feet are we talking about from the line where the garage door comes down and hits the driveway? How many feet from there would you say is the curtilage? Well, I would think in a standard suburban home, and Oliver talks about kind of, in Supreme Court's case, Oliver talks about that this is a concept readily understood in a standard suburban urban home like was involved here, that we're talking about the front yard area, more or less. All the way to the sidewalk. I'm just trying to understand. We've got a driveway. It's a slab, right? There's nothing. There's a car there. There's no bushes except on the side, totally open. So is the curtilage all the way to the sidewalk or does it stop somewhere on the driveway? Well, of course, I don't think it matters in this case because the deputies got within a foot or two of the garage before they could have seen into the garage. But I think, you know, in Jardim, the Supreme Court talks about the right of way. Sorry, where does that one to two feet finding come from? Well, if you look at the photograph of the car that was in the driveway on the night in question, which is at volume three of the excerpt 308, there's a very narrow space between that car and the left side of the frame. And so the deputies, as they said, came out of the property by hugging the house next door, coming over the fence, hugging Mr. Chong's house, and then coming up to that opening. They would have to be very close, but also the deputies themselves and talking about when Deputy Lee and talking about when he made this observation, he said, as I was entering the garage, that's why there was some question as to whether or not he was actually inside the garage. So when I think when you put that all together, that the only inference is he's right there a couple of feet outside the garage. Well, this is why I think Judge Boutier and I are thinking about the same thing here. This is why I'm asking where the curtilage begins and ends, because I'm not sure the record is that clear on where exactly Deputy Lee was when he claims he saw Mr. Tran holding a bag of drugs. I mean, it may matter, because if he was 10 feet away on the far side of the driveway, and I know you don't think that's what happened, but if he was that far away, I'm not sure he's on the curtilage. The closer he gets, the better the argument that he's on the curtilage. And then the question is, where was he? And I'm not sure I know. Well, I think there are two answers to that. Of course, during the original case, the original district court proceedings, defense counsel repeatedly asked for a hearing on exactly that issue to hear from the deputies. So as to where they were, I reviewed that request in the 2255 motion. The district court didn't grant that because I think it relied on an incorrect analysis as to how you define the curtilage, essentially relied on an open fields analysis. So to the extent that there needs to be any clarification about that in the record, that certainly does not fall on the appellants in this case. That was a refusal of the district court in either proceeding to have a hearing on that. But I just think that regardless, when they talk about how they came on the property by coming over the fence, coming across the front of the property, and by the way, getting past, getting into a position where they could see past that privacy fence that protected the front of the property, then you're clearly talking about a situation, as mentioned, Jardine, where the right to repose in your home is invaded upon. But it wasn't his home, though. I mean, he was not yet. There's some question exactly about how much he resided there, but he didn't own the house. It was Mr. Tron's home. Tron's home. Yes. And so there were appellants here, Mr. Tron and Mr. Tron. That's why Mr. Tron has the additional standing issue. But it certainly was Mr. Tron's home. He lived there with his sister, his girlfriend, his sister's husband, and their children. So there's no question as to that. But, I mean, I think it's important, too, when you look at how they come on the property, if they come by climbing over the fence and charging across the front yard armed for a parole search. This isn't just some people coming up, you know, under the front walk to come to the front door to ask some questions about a lost dog or something like that. And they get themselves very close to the house. I mean, they are certainly in an area immediately surrounding the home. The furthest they could have possibly been from the home, I think, and had that perspective past the car and into the garage would be maybe five feet. But I think based on all the evidence that's before the court and Deputy Lee, both in his original declaration and then in his trial testimony saying, essentially, that he was in the garage or that he was entering the garage when he made that observation, I don't think he was. Can I ask, how long is the garage, sorry, the driveway from the garage door to the sidewalk? I don't know exactly, but I think if you look at the photos, it's about a car length and a half or so, it looks like. So maybe that's 20, 25 feet, I would guess. And then there was a car parked the night of the entry that night, correct? I'm looking at 308, ER 308. That's right. And your theory is that the officer, Chong, entered between the car and the side of the garage. I believe that's what Officer Lee said. I believe they said that, and I believe that that's an excerpt from Record 308. That's Volume 3, excerpt from Record 427, that's Volume 4, and excerpt from Record 413, also Volume 4. I think that he was specifically asked, did you go between the car and the garage door frame, and he said yes. Considering where they were coming from and that they were charging in there in reindeer, to think that they might have looped around the back of the car and come in the right side also just is illogical. They were moving pot and doing kind of a swap type charge, more or less. So you're suggesting that they were about to barge into the house just through the front door if the garage door was down? Well, that's a good question. I don't know if they would have knocked and announced or if they would have gone in. I don't know that. Okay, but they certainly would have had a right to walk up to the front door and knock, even if that's considered cartilage looping. Well, yes, I think that there is. Of course, the Supreme Court case is eluding me right now. They talk about the implied license and what are you coming onto the property for and what are you doing, and obviously here they're not coming onto the property to go up and track. They're coming on to raid the house. Well, maybe, but when they're in a place where they have a right to be and they see something, can't they act on it? Well, there are several answers to that, but one is that you can't cause the exigency. You rely on, and the deputy clearly was saying that when they came upon, they came charging up to the garage and they startled Mr. Trump, he threw the baggie away. But also, no, they can't be somewhere. If they're somewhere illegally, when they make the observation, then it's a Fourth Amendment violation, and that's sort of the core argument here, that they were on the cartilage of the property, which the Supreme Court has reiterated recently on the Ninth Circuit. The cartilage is effectively inside the home, just like the garage is effectively inside the home. So if they're already inside the home when they make that observation, it's a Fourth Amendment violation, and this is the fruit of the violation. Mr. President, if—go ahead. Go ahead, James. Well, this isn't a direct appeal from a conviction. This is a question of ineffective assistance of defense counsel for not raising it, correct? That's right. And is it that clear cut from the testimony that this should have been clear to the defense attorney? Well, I believe that it is, and a couple things. To the extent it's not clear cut, we certainly, in all the proceedings, have tried to have a hearing on that. But I think it is clear cut in that, I mean, in the original proceedings, government counsel actually argued, and when this search was challenged, they said this is not a Fourth Amendment violation because it's not cartilage, because it's open to public view. They made an argument that was directly contrary to the recent Supreme Court—the then-recent Supreme Court cases in Jones and this court's opinion in Pereira, which had come out a couple years earlier. And, you know, at least, I don't know, they were on my radar as a lawyer. Those were significant openings in Jones. A competent attorney who was paying any sort of attention to those developments in the law would have said, hold on a second, it doesn't matter if it's open to public view. You can't come out on the property just because it's open to public view. Now, if the deputies had seen something while they were on the street where they were lawfully in a creative exigency, that would be a different matter. But that's not the case here. When they claimed to have seen the exigency was when they were very close to the garage or, you know, arguably the record supports that they were in the garage. Mr. Brensman, there's something artificial about this entire discussion in the sense that this is not— we know this is not the justification for the search. It may be a justification that is sufficient, but it's not what motivated the search. What motivated the search was the parole search. And I guess I want to hear from you as to why the parole search at least wasn't in good faith, because I know there's some question about what the officers knew in terms of whether Trim actually lived there. But why weren't they at least acting in good faith when they thought that they were affecting the parole search, a proper one? Well, my first answer to that would be that that's never been an argument that the government has made. Once it originally won on the parole search issue, then this court came out with its opinion in Granberry, and then it lost on that about a year after it was originally decided. They never said any sort of good faith argument. So that has never been addressed, was never raised in the original district court proceedings. It wasn't raised in the habeas proceedings. So I certainly think it would be late in the game for the government to hang its hat on that argument. But I don't think it's good faith. There's a good faith exception here. I've brushed up on the good faith law recently. But the matter, the question is, based on the facts known to the officer, was there probable cause to believe that Mr. Tron lived there? And the finding in the district court was eventually no. The facts were not sufficient to establish probable cause to believe Mr. Tron lived there. And that was the end of it. Right. I mean, there's some, of course, Mr. Tron submitted a number of declarations in the post-conviction process that certainly suggest that he had a pretty permanent aspect to his time there. That's correct. But it sort of supports to me why the officers thought that the parole search was proper. Well, except the parole search issue is based on what the officers knew at the time, which every probable cause situation, of course, is based on what the officers knew at the time, not what they learned later on. And that, of course, is a reason that defense counsel in submitting something with respect to standing is not at all corrupting the parole search issue. Because the parole search issue, you look at what the officers knew. With standing, you can induce evidence that wasn't based on what the officers knew at all. Then in coming back to the good faith question, I don't think there's any good faith exception for saying, well, the officers thought based on the facts that they knew that there was probable cause. That's a legal question. It's not like they were relying on, you know, Supreme Court case law that changed or anything like that. Counsel, can I ask one more question? And this goes along with what you were saying. Even if we agree with you on the curtilage question, how would that affect Tron? I don't see an effective assistance on Tron's counsel's part. Mr. Tron's counsel in his proceedings submitted declarations indicating that the reason that they didn't induce additional evidence with respect to standing is because they thought there was sufficient evidence to establish that he was an overnight guest, which there clearly was not. Mr. Tron, I'm sorry, I'm not here. Tron had standing to challenge the parole violation. Let's pause the clock here. Let me see if I can turn mine way up. No, I think it's us. Now I can hear you. Now it's super loud. I'm sorry. We're going to pause the clock. We'll let you finish your response to Judge Bumatek's question, and we'll give you time for rebuttal. So go ahead and continue your answer. I didn't hear the whole question. I'm sorry, Judge Bumatek. So your theory, in effect, is that Tron's counsel could have induced evidence showing he had residence or some sort of right in the property, but he already challenged the parole search, so it seems like he already had the standing over the house. Well, no, because the parole search issue is really that they didn't have probable cause to believe that he lived there. The standing issue is based on evidence that could be submitted, not just what the police officers know, but what were the actual underlying facts, and they didn't submit that. I think it's important to consider the timeline as far as how that goes. Tron's counsel originally submits the parole search issue, the challenge of the search on the parole search draft. They submit a brief declaration from him saying, I don't live there, which puts the parole search issue into play. The government responds and says, oh, there was probable cause based on the evidence known to the officers for the parole search, but if there wasn't, we're going to rely on a sort of, you know, fictitious exigency argument, and they say in that context also that Tron doesn't have standing. And so at that point it was incumbent upon defense counsel to answer that alternative fallback argument by saying, challenging the curvilege argument, saying that's wrong, the government's curvilege argument is wrong, and also inducing sufficient evidence of standing, which would not at all step on the parole search issue because the parole search issue is based on what the officers knew. That can't be added to based on declarations as to what actually supports standing. Those are different issues. Okay. Well, we'll give you two minutes for rebuttal, occurrence, and let's hear from Ms. Lang. Good morning, Your Honor. May it please the Court, Rosalyn Lang on behalf of the United States. The government does want to disagree that the central question is about curvilege. I do want to step back and note that the issue here is not so much whether the driveway was curvilege, but whether defense counsel was constitutionally ineffective for not making that argument. Under the Strickland test, it's whether that error was so serious that they were effectively not functioning as counsel. And the answer is no, regardless of whether they might have won on the curvilege argument. If you look at what trial counsel actually did, they did file motions to suppress. They made the Granberry argument that there was a probable cause to believe Tran lived at the residence, and they won that argument. And then when the government made the extra-circumstances argument, Charles counsel argued, A, the garage door wasn't all the way up so the deputies could not see inside, and Tran's counsel argued that the officer was already in the garage when Tran threw the baggy. So those were reasonable arguments to make based on what the defense counsel believed to be the fact at the time. And Strickland says that the standard for attorney performance is reasonableness. That doesn't require an attorney to pursue every possible alternative argument there is, even if one of them may have been a winner. This whole discussion just sort of begs the question of how much of a winner was this curvilege argument? Because if it's a clear winner, it seems your argument's harder. And if it's not a clear winner, then you have a better argument. So to me, it does seem to just fold back onto the question of how powerful was this argument under Jones. And I'm curious as to your view on where the curvilege begins and ends on the front of this house, given just the layout of the driveway and the fact that there's nothing on it like a bush or a wall. I think the government's argument would be that the curvilege is any area of the house that was enclosed, you know, any area surrounding the house that was enclosed. For example, if you look at that photo, there is a sort of white wooden fence to the left of the front door, probably covering a front window there. That area behind there would be curvilege. However, the driveway is essentially an extension of the sidewalk. A lot of garages have windows. I don't know if this one did. I mean, what if the officer stepped on right up to the garage door and looked in the window and saw these defendants with drugs? Is that okay or not? Yeah, and I think that is comparable to officers going up to a front door, and maybe there's a window on the side of the front door. They can't obviously run a drug dog there. They can't be rummaging around in these bushes. But, you know, if they knock on the door and they're just looking around, you know, with naked eye observation, as the Supreme Court has said, naked eye observation like that is not a search. And the driveway is so open that there could not have been a reasonable expectation of privacy in it. In Florida versus Hardin's or Hardina's, the Supreme Court said the area immediately surrounding constitutes curvilege. So how is that consistent with your argument? I think all of those cases, they don't simply say the area immediately surrounding the home. Hardina's even also quotes Oliver, and Oliver has the language about the area to which, you know, associated with the intimate activities of life and the sanctity of home. So the front porch was considered categorically curvilege in Hardina's. But there was an implied consent theory there. But, you know, if you had a window in your front yard and you can't just walk up to it and an officer can't just walk up to it, therein you would agree with that, right? I think that's what Hardina's, that's the implication of Hardina's, although they didn't explicitly, you know, make that ruling. But certainly, again, there is this implied license. If you are lawfully at the front door, the officer can look around. Can we try to get the factual, where did Officer Lee, as the one that saw Mr. Chong throwing the methamphetamine, where was he when he saw that? He was outside of the garage, 10 to 15 feet away from the defendant inside the garage. Right. So where was that with respect to how close was he to the garage door opening when he saw it? You know, it does not, the record does not say. It says that, it simply says that he was outside the garage and that he was 10 to 15 feet away from the tram. If we were to hold that, the curvilege is, you know, a certain immediate vicinity around the house. And we don't know where he was with respect to the house, would you have any objection to demanding for factual finding or evidentiary hearing where he was standing? I mean, I think this issue, you know, the previous panel on direct appeal in the Ninth Circuit did say that the officers were lawfully outside the garage, and then because of accident circumstances, they went into the garage to seize the drugs. So, I mean, again, I don't think in this context, you know, this is the proper procedure for litigating a factual issue that, you know, normally would have been litigated in the district court. Again, this is a situation where the only issue is ineffective assistance of counsel. And I think the fact that there is some dispute, there's reasonable dispute, about what the answer to this is just shows that there wasn't ineffective assistance of counsel because it wasn't, you know, such an obvious winner. And the district court said specifically that this is not a close case. It looked at the picture of the house and said there is no way that driveway is privileged. It just said it could not have been more clear. And when the case was, you know, being litigated, he said even getting out of your car, you would have been able to see what was going on in the garage when the garage door was fully open. But the officers were not getting out of their car. They were kind of moving in on this house, correct? That's correct. They actually were already on the driveway. But the fact that Tran had the garage door open means that his activities were not protected by the Fourth Amendment because they were open to public view. And that's what the district court said in Toronto, which is if you expose your activities to public view, there's no reason that you should – there's no reasonable expectation of privacy in that. Right. But under Jones, if the officers were in the curblidge when they saw it, that doesn't matter. Well, I mean, I don't think – I mean, Jones, they specifically occupied, you know, a piece of the defendant's property in order to conduct their search. And here the officers are simply standing, you know, on the driveway. And, you know, even – let's say even if it was curblidge, there is an implied license for them to be standing on the driveway. I – Judge Lasnik was saying earlier, if they were going up to the front door to do a parole search, they justifiably could have gone to the front door. In this case, the garage door is open. Tran is in the garage. It's just reasonable for them to be able to walk up to the driveway to engage with Tran in the driveway. There's an implied license because the garage is open or because this is a part of the property that a visitor could be expected to walk on or both? Yes. Well, the latter, really. Any neighbor walking their dog could have walked up the driveway if they saw, you know, wanted to, you know, go up and talk to him. It's not like Tran was in the backyard and, you know, the neighbor would have gone around the gate and into, you know, a more private area of the home. So it's simply reasonable that the officers could have gone onto the driveway to engage with them. They're not obligated, even if they were conducting a parole search, to simply have to stand on the sidewalk and shout at him, you know, from the street or the sidewalk. Can you speak to the parole search issue, the parole search exception? Yes, and I don't believe that this is a situation that was actually a parole search because a parole search is a warrantless search, and that's not where the officers sit here. They went up on the driveway, they saw Tran throw a baggie, and the next thing they did was to immediately secure the house and get a warrant. If it had been a parole search, they would have relied on the fact that he was, they believed he was a resident, in order to search the house without a warrant. So that's why I would not characterize this. They may have intended to do a parole search, but that's not what it ended up as. It ended up as a search pursuant to a warrant. Is that really the right way to think of this, I guess? Because the initial part of this was not pursuant to a warrant. It was the seeing of Tran with drugs that then put in motion a bunch of other events, and I had thought that the whole purpose of going to this house in the first place was that they believed he was there and he was subject to different parole conditions, and that was the justification for being able to engage with him in the first place. And you're right that they did get a warrant, but that followed the initial realization that he had drugs. It's true there was plenty of evidence that he did have drugs, and they did go there, I believe with the intention to detain him and, if possible, try to be able to search the house. But, again, you know, we have to look at what actually happened as opposed to what might have happened. And I guess before I sign off, I do want to point out that even Tran's best evidence of standing isn't good. Even with all of the declarations that were filed in support of the 2255, Tran still doesn't have standing. No one in those declarations says that Tran was an overnight guest on the day of the actual search. And so in terms of the – and it goes back to the ineffectiveness of the counsel. I believe counsel was just doing the best with what they had at the time. They can't have been ineffective because the standing argument just isn't there, and it's reasonable if they didn't have a good argument on standing. So at least they could preserve their ability to argue at trial that Tran was not associated with the house. And if Your Honors don't have any more questions, good for you. Thank you. Thank you so much. Thank you. So with respect to the cartilage argument being addressed in direct appeal, of course the panel on direct appeal said the cartilage argument was waived. That's sort of why we're here. With respect to the implied license, it's not something that the government has really ever relied on before, but I believe it's Judge Eaton that puts that to rest because the reason that they're there and what they do indicates whether or not they have an implied license. Implied license means they're walking the dog around, and the court said, you know, there's not an implied license to come up and walk a dog around there. Similarly here, there's not an implied license for deputies to climb over a wall and charge across the property. Regarding the government's, you know, argument on the cartilage issue, falling back on this performance and ineffective assistance to counsel, it's not an argument they've ever made before. What they've always argued is that the cartilage argument was a loser, and so counsel did not perform, you know, efficiently in not raising it. So that has always been the focus of the case is whether or not the cartilage argument was a winner.  Another thing, which is that if the area is not enclosed, that there is not cartilage, and that's just wrong. That's the wrong from the moment that they made it. It's contrary to Jones. It's contrary to Pereira. Pereira specifically said that completes the ability to see into the cartilage with the ability to go into the cartilage. Certainly they can stand there on the street and see whatever they can see based on what they can do after. They can't enter the cartilage until they see something, so they either have a warrant or until they have legal justification, and they didn't have either of those things. Finally, the idea that this was a search pursuant to a warrant, of course ignores the obvious problem with that, which is that the warrant was obtained based on the proof of the illegal entry, which wasn't, by the way, just in the garage. They went into the house. They started searching the house, et cetera, et cetera, and then they decided to go get a warrant. And in the warrant application, they included what they found during this initial illegal entry. But, Mr. Bernstein, this is like a law school exam, you know, for criminal procedure where you can go this way, that way on this issue, this way, that way on this issue. You know, we've got standing. We've got cartilage. We've got parole search. We have good faith exception. If it's that close, how can it be an effective assistance to counsel? With all due respect, Your Honor, especially on the cartilage issue, I don't believe it's a complicated issue. They made the wrong argument, the government did, in the district court initially, that because you could see in there, you could enter in there. And Jones makes crystal clear, and Perera makes crystal clear, in unavoidable language, you're conflating being able to see in there with being able to enter in there. If it wasn't a close case for you the other way, you may have been wrong, but doesn't that show that it's a difficult area? I don't think so. I think the trial judge just plainly got it wrong. And, you know, if that were the measure, of course, there would almost never be an effective assistance to counsel claims in these sort of circumstances. Thank you. Okay. I think we have your argument, and I want to thank both of you for your presentations this morning. This measure is submitted.
judges: BRESS, BUMATAY, Lasnik